IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| MVP LANES, LLC<br>26 South Street<br>Baltimore, MD 21202 | * * * * | CIVIL NO. RDB-11-2402 |
| Plaintiff | * * | |
| vs. | * * | |
| RI HISPANIC BANC GROUP, LLC<br>1352 Newport Avenue<br>Pawtucket, RI 02861 | * * * * | |
| Defendant | * * | |

*************************************************************************

**MVP LANES, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

MVP Lanes, LLC, by undersigned counsel, herein respectfully submits this Memorandum in Support of its Motion for Temporary Restraining Order and for Preliminary Injunction.

**FACTS**

1. Plaintiff MVP Lanes, LLC is a Maryland Limited Liability Corporation. Its business office is located at 26 South Street, Baltimore, Maryland 21202.

2. Defendant RI Hispanic Banc Group, LLC is a Rhode Island Limited Liability Company with its current office located at 1352 Newport Avenue, Pawtucket, Rhode Island 02861.

3. MVP Lanes, LLC ("MVP") developed and began construction of a 63,000 square foot bowling and entertainment complex in the Hunt Valley Towne Centre of Baltimore County, Maryland. It invested millions of dollars, entered into a lease, and engaged in a myriad of other business activities that would bring the concept to fruition. When it opens, MVP will employ more than 120 people. See Affidavit of Marc Seldin Rosen, Managing Member of MVP Lanes, LLC, attached as **Exhibit A**.

4. MVP was in need of financing and was introduced to Defendant RI Hispanic Banc Group, LLC ("RI Hispanic"). RI Hispanic is in the business of leasing Stand-by Letters of Credit.

5. After a period of negotiations, MVP and RI Hispanic agreed to enter into a contract (the "SBLC Agreement") through which MVP leased a 366 day Stand-by Letter of Credit (SBLC) in the amount of $65 Million (U.S.) from RI Hispanic. See **Exhibit B**.

6. MVP and RI Hispanic signed the SBLC Agreement on April 13/14, 2011.

7. The SBLC Agreement is intended to provide MVP a $65 Million SBLC which is to collateralize a loan from pre-approved third party (hereinafter the "Funding Party"). **See Exhibit B.**

8. The SBLC Agreement required that MVP deposit a total of $90,000 in an escrow account in two separate tranches. The first deposit, $25,000, would cause RI Hispanic to create the SBLC draft, known as a "Pre-Advice" and send it via SWIFT[1] to the Funding Party's representative for approval, and the second tranche, $65,000, would cause RI Hispanic to deliver the approved SBLC via SWIFT to the Funding Party's bank. In both instances, MVP was to

---

[1] A SWIFT is a secure electronic transmission utilized in the banking industry to forward, among other things, commercial instruments such as SBLC's.

have been provided actual confirmation that the SWIFT was "received, authenticated, verified, and accepted." The SBLC Agreement also required that RI Hispanic independently assess and confirm in writing with MVP that it was satisfied with the Funding Party's ability to complete the transaction before MVP made its second escrow deposit (for $65,000). **See Exhibits A, B, C and D.**

9. The SBLC Agreement allows the Funding Party five (5) business days following delivery of the SBLC to its account to wire the loan proceeds to MVP, RI Hispanic, and several third party advisors.

10. On April 14, 2011, after the SBLC Agreement was signed, MVP caused $25,000 to be wired to RI Hispanic's designated escrow agent as agreed. **See Exhibit A**.

11. On June 8, RI Hispanic and MVP amended the SBLC Agreement for the limited purpose of substituting a new Funding Party. **See Exhibit E.**

12. On June 16, 2011, RI Hispanic gave MVP written notice that it was satisfied that the substituted Funding Party has funds on account sufficient to complete the transaction, and it requested that MVP wire the balance due ($65,000) to escrow. **See Exhibit F**.

13. On June 17, 2011, MVP funded escrow, thus completing its escrow obligations to RI Hispanic. **See Exhibit A**.

14. Upon information and belief, RI Hispanic withdrew the $65,000 from escrow, yet it is a fact that it has never provided MVP with **actual** confirmation that the SBLC was "received, authenticated, verified, and accepted by" the Funding Party's bank. Instead, it has merely represented to MVP that it performed under the SBLC Agreement. Indeed, RI Hispanic claimed in a sworn statement that it caused its bank to send the referenced SBLC via SWIFT to the Funding Party's bank, that its bank received acknowledgment of the delivery of the SBLC by

SWIFT, and that it received an additional confirmation of delivery of the SBLC by the Funding Party's Global Trade Services back office. **See, e.g. Exhibit G** [Affidavit signed by, among others, Martien Eerhart, Managing Member of RI Hispanic at page 2, first paragraph] and **Exhibit H9**. None of this information has been shared with MVP.

15. Notwithstanding the representations referenced in Paragraph 14 above and, more particularly, notwithstanding RI Hispanic's sworn statement indicating that it sent the SBLC by SWIFT, that it has delivery confirmation back from the Funding Party's bank, and that it obtained an additional confirmation, the Funding Party's bank has been unable to locate the SWIFT transmission of the SBLC in its system. **See Exhibits H11** (Blackberry message from RI Hispanic reporting his conversation with the Funding Party's bank), **H17, H22, and H23** (email from Funding Party's bank). Consequently, the Funding Party's bank has been unable to escalate the instrument to the Funding Party's account. Unless that is accomplished, the entire transaction fails and MVP will lose its lease, its investment, its employment opportunities for 120 people, and its very existence will be in doubt.

16. MVP, the Funding Party, and various intermediaries have demanded that RI Hispanic provide **actual** confirmation that the SBLC was "received, authenticated, verified, and accepted" by the Funding Party's bank. These demands have been made by phone, in person, by letter, and by email on many dozens of occasions. The precise form of proof necessary to identify the SBLC that RI Hispanic contends is in the Funding Party's bank's electronic database is a true copy of the SWIFT that was allegedly transmitted by RI Hispanic's bank to the Funding Party's bank. **See Exhibits A, H2, H3, H5, H6, and I** (Letter from MVP to Martien Eerhart, Managing Member of RI Hispanic.)

4

17. If the Funding Party's bank is provided a copy of the SWIFT, it will be in a position to identify the SBLC in its system if, in fact, it resides there. Without it, it cannot. **See Exhibits H22, H23.**

18. MVP and the Funding Party have provided RI Hispanic with the name of three (3) persons at the Funding Party's bank who are desirous of receiving and who are waiting to receive a copy of the SWIFT that RI Hispanic alleges that it sent. **See Exhibit H1**.

19. MVP and the Funding Party have asked RI Hispanic to identify the names and to provide the contact information for its bankers who were responsible for issuing the SBLC and causing it to be transmitted by SWIFT to the Funding Party's bank. **See Exhibit H1**. RI Hispanic has promised, but has failed and even refused to provide this information. **See Exhibits H2, H10**.

20. RI Hispanic has advised MVP that it would cancel its SBLC Agreement if anyone other than the Funding Party's bank has any direct communications with RI Hispanic's bank. **See Exhibits G and I**. Yet, RI Hispanic has frustrated this approach by consistently failing to share with the Funding Party's bank representatives the name and contact information of anyone at the issuing bank with whom they can communicate! **See Exhibit H2.**

21. MVP, in this action, requests a Court Order requiring that RI Hispanic produce and send to the Funding Party's bank and to MVP a copy of the SWIFT and SWIFT confirmations that it alleges that it delivered to and received from the Funding Party's bank to meet its obligations under the SBLC Agreement.

22. In response to MVP's and the Funding Party's many demands that RI Hispanic provide the Funding Party's bank a copy of the SWIFT containing the SBLC, RI Hispanic has promised cooperation. **See e.g. H7, H8**. Notwithstanding its many promises, which include

5

dates and times when it would send the copy of the SWIFT and even, on occasion, the name of its banker that can be contacted, **see, e.g. H7, H8, H11, H12, H17, H21, H25, and H26**, RI Hispanic has failed to act, **see e.g. H13, H18**, and has instead offered no more than a steady stream of excuses, false statements, and improbable explanations.  For example: (a) RI Hispanic has insisted that it doesn't have to send a copy of the SWIFT because it says that several employees of the Funding Party's bank and/or its investment bank affiliate have already seen SBLC – an excuse that has been unverified, **see H8, H12**, and which RI Hispanic cannot back up by identifying by name any such person, **see H2, H8,**; (b) RI Hispanic has speculated that the Funding Party's account was incapable of receiving the SBLC based on RI Hispanic's supposition that the account was not adequately "seasoned" or funded – and assertion that has been evaluated and refuted by the Funding Party and its bank, **see H17**; (c) RI Hispanic has claimed that its bankers have been "unavailable" to transmit the copy of the SWIFT by email, even to the point of stating that a holiday caused them to not be at work when, in fact, there was no such holiday and the bank was open, **see H5**; (d) RI Hispanic has stated that its bankers (who it refuses to identify) have spoken with unidentified investment bankers employed by the Funding Party's affiliated investment bank – but who have no relationship to this transaction or to the Funding Party, **see H8, H12**; and (e) RI Hispanic has claimed that its bank has called the Funding Party's bank, but couldn't make contact – a disingenuous assertion since the Funding Party has three bankers waiting and none have even received messages.  The two calls that did take place resulted in the Funding Party's bank asking for a copy of the SWIFT, as the code numbers that it was given did not provide enough information so that the SWIFT and SBLC could be located within its system.  **See H22, H23**.

23. On August 23, 2011, MVP conducted a 10:00 a.m. conference call with Martien Eerhart, Managing Member of RI Hispanic, a representative of the Funding Party, two intermediaries, and the Managing Member of MVP. During that meeting, RI Hispanic agreed, as it had on several occasions since the SBLC Agreement was executed, that it would, that day, cause its bank to send the Funding Party's bank a copy of the SWIFT and that it would also disclose to the Funding Party's bank the names of one or more representatives at RI Hispanic's bank who could be contacted by the Funding Party's bank thereafter. RI Hispanic committed to completing this task that day. **See Exhibit H30**. Rather than completing its commitment, RI Hispanic failed to deliver the SWIFT and reported to MVP and the Funding Party that the Funding Party's bankers were contacted and said that they did not want to see a copy of the SWIFT. **See Exhibit H31.** That report was false. The Funding Party's banker actually asked for the SWIFT so that the SBLC could be located if it was delivered as RI Hispanic contends. **See Exhibit H32**.

24. The Funding Party has placed MVP and RI Hispanic on notice that it intends to issue a cancelation order and would withdraw its funding commitment because it has not received the SBLC in its account as required. The cancelation of funding will have devastating consequences, and RI Hispanic has been warned repeatedly about this. **See Exhibits H20, H21, and H22.**

25. The transaction was to have closed in June 2011. **See Exhibits B, F, and H18.**

26. The Funding Party's bank has stood ready, willing, and able to receive the email version of the SWIFT to help identify it in its system (if it was sent, by SWIFT, as RI Hispanic represents), **see Exhibits H2, H3, H19, H20, and H23**, and the Funding Party has indicated that its patience has been exhausted due to the unexplainable failure to deliver the SBLC as required

and what it considers to be absurd excuses by RI Hispanic.  **See Exhibits H3, H7, H20, H21, H22, and H29.**

**27.**  RI Hispanic's failure to cooperate is threatening the financing of the MVP project and will cause devastating, irreversible, consequences.  **See Exhibits A, H14, H15, H16, H24, H27, and H28.**

28.  The space that MVP leased is unique to its success, and MVP will lose its opportunity to remain at Hunt Valley Towne Centre if this funding fails.  Its landlord has threatened to withdraw from an existing Forbearance Agreement if this funding is not promptly completed, or if another willing tenant surfaces.  **See Exhibits A and H24**.

29.  MVP will go out of business, and perhaps have to file bankruptcy if this funding fails.  **See Exhibit A**.

30.  Other serious consequences will befall MVP's contractors, who are owed money, and should MVP fail, it has been represented to MVP that several of their businesses will fail.  **See Exhibit A.**

## ARGUMENT

### A.  Standards for Preliminary Injunction

A preliminary injunction should issue to prevent irreparable harm.  The elements required to support the request are a showing that the plaintiff: (1) is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm absent preliminary relief; (3) that balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Silverman Thompson Slutkin and White, LLC v. Supermedia LLC*, Jan. 15, 2010 WL 234993 (D.Md.) *citing In re Microsoft Corp. Antitrust Litg.*, 333 F.3d 517, 524-26 (4th Cir. 2003); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009); *Silva v. East Providence Housing*

*Authority*, 390 F. Supp. 691, 695 (D.R.I. 1975); *In re State Employees' Unions*, 587 A.2d 919, 925 (R.I. 1991).[2]

### B. Likelihood of Success on the Merits

In this case, MVP has presented a contract, the SBLC Agreement, which clearly requires that RI Hispanic issue and deliver by SWIFT an SBLC in the amount of $65 Million. As evidenced on Exhibit "B" [the SBLC Agreement] and on the attachments to Exhibits "C" and "D" [Escrow Agreements], RI Hispanic agreed that to fulfill its obligations it was also required to provide confirmation that the SBLC was "received, verified, authenticated and accepted" by the Funding Party's bank.

RI Hispanic has not performed. It has claimed that it created the SBLC, and it has claimed that it delivered it to the Funding Party's bank, but it has not in any way proven this to be true, and it certainly has not demonstrated that the Funding Party's bank has received it, verified it, authenticated it, or accepted it.

MVP and the Funding Party, as well as intermediaries, have expended enormous energy and resources in attempting to force RI Hispanic to disclose the SWIFT of the SBLC so that if it exists, this confirmation process can be concluded. Although RI Hispanic has expressed its willingness to send a copy of the SWIFT to the Funding Party's bank, and to identify its bankers who can resolve any issues, it has never done so.

Inasmuch as the only relief presently requested are the documents that are required to be provided by contract, that have been promised, that RI Hispanci asserts that it has already sent

---

[2] The SBLC Agreement states that the governing law over disputes relating to the Agreement will be guided by the law of Rhode Island. For injunctions, its laws and Maryland's are the same.

to the Funding Party's bank, and that would, in all events, be disclosed in discovery, it is apparent that MVP Lanes, LLC meets its burden.

### C. Likelihood of Irreparable Harm to MVP

If the subject transaction fails, which could happen at any moment unless RI Hispanic performs by sending the Funding Party's bank a copy of its SWIFT transmission, MVP will lose its lease, lose its funding, and be forced into bankruptcy. It will go out of business. The space identified for MVP is unique, and the design of MVP and, in fact its entire business plan, were developed based on the demographics of the Hunt Valley location and the physical plant that it negotiated with its landlord.

On the other hand, no harm could possibly be experienced by RI Hispanic if it is compelled to immediately produce an email copy of an original document that it alleges that it already distributed to the Funding Party's bank. The copy is needed to locate the original.

In fact, if RI Hispanic performs as MVP insists it must, it will be paid. Absent performance, it too will be harmed.

### D. Balance of Equities Favors MVP

MVP, in this action, asks only that RI Hispanic immediately fulfill its obligations under its SBLC Agreement. Performance will result in significant payments to both MVP and to RI Hispanic, but a failure of immediate performance will be devastating to MVP. It will not only lose millions of dollars, but it will also lose its lease and its business. It does not have time to allow this situation to percolate. Months have been lost, it has been given notice of potential termination by the Funding Party and by its landlord, and there will be impossible to recover if any of those events transpire.

MVP's contractors will not be paid, and although they are not parties to this action, many will also file for bankruptcy protection. The business opportunity for MVP is one of a kind, and it is reliant on performance by RI Hispanic. In sum, RI Hispanic is being asked to do only what it agreed to do and what it purports to have done already, but which it has failed to establish, and it needs to provide the requested information promptly.

### E. The Public Interest

MVP, when it opens, will employ over 120 full time people, will be able to fulfill its own contractual commitments to other businesses that have participated in its partial construction, will incur and pay its taxes, and will otherwise offer Baltimore and its surrounding area another unique environment for its residents and visitors. There are no negative ramifications if RI Hispanic fulfills its contractual obligations.

### ADDENDUM

The SBLC Agreement has a choice of law provision stating that Rhode Island law will govern. *See* Exhibit B, § 12.3. It also contains an arbitration provision. *See* Exhibit B, § 12.5. Nevertheless, his Court retains simultaneous jurisdiction over this dispute as the need for equitable relief is immediate, and resorting to Arbitration in the first instance will frustrate MVP's ability to obtain it. *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986). Divesting the district court of the authority to enter a preliminary injunction would otherwise render any subsequent arbitration process, particularly in this case, a "hollow formality." *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985). It is for that reason that Complaint is narrowly tailored and is limited to a request for the equitable remedies that are immediately necessary for Plaintiff, MVP's, survival. MVP will pursue its damages claims and other remedies, as well as a permanent injunction, if needed, in Arbitration.

WHEREFORE, for the reasons set forth, MVP Lanes, LLC requests that a Temporary Restraining Order be entered, to be followed by a hearing and Preliminary Injunction, both requiring that RI Hispanic immediately deliver to the Funding Party's bank and to MVP true copies of the SWIFT version of the SBLC that it contends that it sent to the Funding Party's bank, as well as all transaction receipts and confirmations that it received in association with that transmission.

Respectfully submitted,

_____
Marc Seldin Rosen
Federal Bar No. 02589
Rosen & Warshaw, LLC
26 South Street
Baltimore, Maryland 21202
(410) 244-1155

*Attorney for MVP Lanes, LLC*