IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

MVP LANES, LLC        *

      Plaintiff        *

vs.                    *           **Civil No. RDB 11-CV-2402**

RI HISPANIC BANC GROUP, LLC    *

      Defendant       *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MVP LANES, LLC'S OPPOSITION TO DEFENDANT RI HISPANIC BANC GROUP, LLC'S MOTION TO DISMISS FOR LACK OF JURISDICTION

Plaintiff, MVP Lanes, LLC, by its undersigned counsel, submits this Opposition to Defendant RI Hispanic Banc Group, LLC's Motion to Dismiss for Lack of Jurisdiction.

## INTRODUCTION

Defendant RI Hispanic Banc Group, LLC ("RI Hispanic"), of Rhode Island, whose alter ego is Martien Eerhart ("Eerhart"), a resident of Nantucket, Massachusetts, defrauded Plaintiff, MVP Lanes, LLC ("MVP"), a Maryland corporation. Using electronic messaging, telephone calls, and other forms of communication, such as letters and text messages that were intended to reach and that did reach into Maryland, Eerhart lured MVP into a fraudulent contract in which RI Hispanic represented that it would cause Scotia Bank to issue a $65 Million Stand-by Letter of Credit ("SBLC") to support MVP's financing of a project in Baltimore County, Maryland. RI Hispanic and Eerhart duped MVP into wiring funds totaling $90,000 to what purported to be an IOLTA account managed by their chosen escrow agent, Jose R. Yanez, of Cape Canaveral Investments Corp., also using emails and other communications directed to MVP in Maryland. The account at JP Morgan Chase designated by RI Hispanic and Eerhart to receive $90,000 of

MVP's funds does not appear to have been an IOLTA account at all, and the escrow agent has disappeared. Presumably, MVP's $90,000 disappeared with him.

RI Hispanic and Eerhart have continuously attempted to conceal their fraud. They have sent many, many emails to MVP in Maryland offering a myriad of explanations as to why the SBLC did not reach its intended destination. They have blamed the Funding Party's bank, Bank of America, and feigned confusion. They have falsely claimed to have caused the Belgian entity, SWIFT, to undertake an independent investigation to locate the SBLC. MVP believes that no such investigation ever occurred and that the documentary proof that RI Hispanic provided was bogus. In Baltimore, RI Hispanic produced a bogus SBLC (it had no bank officer's names or PIN numbers and it was dated 2001.)

Notwithstanding the language of many writings signed by Eerhart, including the SBLC Agreement itself (which was a complete misrepresentation), a Sworn Statement (signed by Eerhart personally and on behalf of RI Hispanic), and many emails directed to MVP in Maryland, that expressly stated that RI Hispanic was in direct communication with Scotia Bank, Eerhart has now conceded in testimony before the United States District Court for the District of Maryland that he never had a direct relationship with Scotia Bank, and that he has never even spoken with anyone at Scotia Bank. Eerhart has claimed that he has no money, that he has a "partner" in the transaction who he never met (James Pierce) and a funding source/hedge fund that he has refused to identify.

Without any doubt, RI Hispanic and Eerhart purposefully and systematically availed themselves of the privilege of conducting activities in the State of Maryland. Unfortunately, those activities were illegitimate.

Defendant has filed a motion to dismiss this case for lack of jurisdiction.  This Court and this State, however, have a genuine and real interest in protecting its corporate citizens from this kind of fraud.   The Maryland long arm statute and the relevant case law, discussed below, establish due process standards that are clear and when applied to the facts alleged and conceded, lead to only one reasonable conclusion:  This Court has jurisdiction over RI Hispanic and its alter ego, Martien Eerhart, in this case.

## FACTS

1.      MVP is a Maryland Limited Liability Corporation.  Its business office is located at 26 South Street, Baltimore, Maryland 21202.

2.      RI Hispanic is a Rhode Island Limited Liability Company with its principal office located in Providence, Rhode Island and a "home" office in Nantucket, Massachusetts.[1]  Its sole owner and alter ego is Eerhart.

3.      MVP developed and began construction of a 63,000 square foot bowling and entertainment complex in the Hunt Valley Towne Centre of Baltimore County, Maryland.   In 2011, MVP was in need of financing and was introduced to RI Hispanic.  RI Hispanic, through Martien Eerhart, fraudulently represented to MVP that it had a direct banking relationship with Scotia Bank and that RI Hispanic could cause Scotia Bank to issue a $65 Million Stand-by Letter of Credit (SBLC) to MVP for the purpose of collateralizing a loan that would fund MVP's project in Baltimore County, Maryland.    Eerhart led MVP to believe that RI Hispanic had the credit available and in place to support this $65 Million SBLC transaction.

---

[1] Eerhart sold the real estate and improvements where RI Hispanic was registered to do business in Pawtucket, Rhode Island on July 25, 2011.

4.     Based upon MVP's reasonable reliance on the fraudulent representations made by Eerhart, MVP signed the SBLC Agreement and the associated fraudulent escrow agreements that contained the material misrepresentations regarding RI Hispanic's relationship with Scotia Bank and the escrow agent.   These documents were drafted by RI Hispanic and then were sent to MVP's development consultant in New York with the intention that they would be forwarded to MVP for signature in Maryland.  After edits, the final versions were circulated to MVP, and the escrow documents to RI Hispanic's designated escrow agent (whose true location is unknown at this time).

5.     The SBLC Agreement identified MVP as a Maryland corporation, and required that MVP deposit a total of $90,000 in what RI Hispanic represented was an IOLTA account. The first deposit, $25,000, would cause RI Hispanic's bank, Scotia Bank, to create the SBLC draft, known as a "Pre-Advice" and send it via SWIFT[2] to the Funding Party's bank representative for approval, and the second transfer of $65,000 would cause RI Hispanic's bank, Scotia Bank, to deliver the approved SBLC via SWIFT to the Funding Party's bank.  **See Exhibits A, B, C and D.** [3]  As stated above, this was a fraud.  Scotia Bank was not RI Hispanic's bank and they had no direct relationship.

6.     Defendant RI Hispanic designated Cape Canaveral Investments Corp. as the escrow agent and falsely represented to MVP that the account information it supplied relating to

---

[2] A SWIFT is a secure electronic transmission utilized in the banking industry to forward, among other things, commercial instruments such as SBLC's.

[3] The exhibit references are to materials already submitted to the Court as attachments to MVP Lanes, LLC's Memorandum in Support of its Application for TRO and Preliminary Injunction and that were filed under Seal. Additional documents were submitted as attachments to MVP's Supplemental Memorandum, and were also filed under Seal.  This Memorandum includes only two additional documents, identified as Exhibits J and K.

that account was that of an IOLTA (Interest Only Lawyer's Trust Account) controlled by Jose R. Yanez.  MVP reasonably relied on RI Hispanic's representations.

7.     On April 14, 2011, after the SBLC Agreement was signed by all parties, at RI Hispanic's request, MVP caused $25,000 to be wired to RI Hispanic's fraudulently designated escrow agent at a JP Morgan account that is said to be based in Florida.  **See Exhibit A**.

8.     On May 17, 2011, Eerhart, as the Managing Member of RI Hispanic, wrote a letter to MVP's development consultant in New York, acknowledging that the SBLC Agreement between itself and MVP related to MVP's development in Baltimore County**.**  In the reference line Eerhart stated that the subject of the letter was MVP's project with GG Commercial Real Estate.  **See Exhibit J (a new Exhibit, attached hereto).**  The business group that manages the entity that leased the space in Hunt Valley, Maryland to MVP and which owns a controlling interest in the leasing entity is known as Greenberg Gibbons Commercial.  In his May 17 letter, Eerhart falsely stated: that RI Hispanic "… confirm[s] approval for the issuance of a $65 Million Stand-by Letter of Credit (SBLC) for MVP Lanes has occurred."

9.     On June 8, 2011 before MVP realized that its entire relationship with RI Hispanic and Eerhart was grounded in fraud, RI Hispanic and MVP amended the SBLC Agreement for the limited purpose of substituting a new Funding Party.  **See Exhibit E.**

10.     On June 16, 2011, RI Hispanic, as part of its ruse intended to extract funds from MVP without performing its agreed upon obligations, wrote MVP a letter addressed to MVP's Managing Member in Baltimore County, Maryland, that was sent to MVP by email to Maryland stating that RI Hispanic was satisfied that the substituted Funding Party has funds on account sufficient to complete the transaction.  In that letter, Eerhart requested that MVP wire the balance due ($65,000) to this same (now known to be bogus) IOLTA account.  **See Exhibit F**.  This

letter was part of the fraud designed to deprive MVP of its funds.  Specifically, RI Hispanic intended that MVP would wire the money to the bogus IOLTA account.

11.     On June 17, 2011, MVP wired the $65,000 to the escrow account, thus completing its obligations to RI Hispanic.  **See Exhibit A**.  Thereafter, Eerhart, on behalf of himself and RI Hispanic, sent MVP (in Maryland) and others a myriad of emails that were intended to complete the fraud without RI Hispanic ever having to perform any of its obligations under the SBLC Agreement.

12.     The transaction was to have closed in June 2011. **See Exhibits B, F, and H18.**

13.     MVP, the Funding Party, and MVP's development consultant were given many excuses and explanations when they inquired and complained about RI Hispanic failure to perform its obligations.  RI Hispanic and Eerhart insisted that the $65 Million SBLC had been established and transmitted to the Funding Party's bank, Bank of America, by SWIFT as agreed in the SBLC Agreement and its amendments.  Several of the emails sent by Eerhart to MVP demonstrate this and were submitted to the Court previously.  The Funding Party's bank, Bank of America, denied receipt of the SBLC by SWIFT or by any other means, and the Funding Party threatened to terminate its involvement in the transaction.  MVP insisted on seeing the actual evidence in the form of documentation that performance by RI Hispanic took place as claimed. In furtherance of the ongoing fraud, on August 7, 2011, Eerhart, individually and as Managing Member of RI Hispanic, signed a Sworn Statement that included: (a) the fraudulent assertion that that RI Hispanic caused Scotia bank to send the referenced $65 Million SBLC via SWIFT to the Funding Party's bank, Bank of America; (b) the fraudulent representation that Scotia Bank is RI Hispanic's bank; (c) the fraudulent assertion that Scotia Bank received acknowledgment of the delivery of the SBLC to the Funding Party's bank (Bank of America) by SWIFT, and (d) the

fraudulent claim that Scotia Bank received an additional confirmation of delivery of the SBLC by the Global Trade Services back office (of Bank of America). **See, e.g., Exhibit G** (Affidavit signed by, among others, Martien Eerhart, Managing Member of RI Hispanic at page 2, first paragraph) and **Exhibit H9**.  In fact, Eerhart and RI Hispanic have no relationship with Scotia Bank, Eerhart has never even spoken with it directly (at least according to his testimony which differs radically from his writings), and there is no real proof that a legitimate SBLC was even created, much less delivered to Bank of America.  This Sworn Statement was sent to MVP in Maryland and related exclusively to the SBLC that was intended to support the financing of MVP's project in Baltimore County, Maryland.

14.     During this time and after, Eerhart, for himself and as the alter-ego of RI Hispanic, sent MVP and the Funding Party's bank, Bank of America, on a "wild goose chase" to locate the SBLC that was never issued.  Dozens of phone calls and emails were exchanged, and RI Hispanic's misrepresentations absorbed the time of the parties, their consultants, the Funding Party, and its bankers at Bank of America.  These acts, which included misrepresentations made by telephone and by email sent to MVP's Managing Member in the State of Maryland, and by text messages, email, telephone conversations, and personal meetings with third parties, were all nothing more than a ploy to cover up RI Hispanic's and Eerhart's scheme to deprive MVP of its assets.  Upon information and belief, the Funding Party's bank, Bank of America, referred the entire matter to its Compliance Department.  It was unable to locate the SWIFT transmission of the SBLC in its system. **See Exhibits H11** (Blackberry message from RI Hispanic reporting his conversation with the Funding Party's bank), **H17, H22, and H23** (email from Funding Party's bank).

15.     Eerhart, who orchestrated the scheme to deprive MVP of its funds (the subject $90,000) also intended to subject MVP to $9.75 Million in default claims under the SBLC Agreement. He did so by persisting in his claims that he was in direct contact with Scotia Bank which he falsely represented as having told him personally that the $65 Million SBLC had been properly issued and delivered (at least until he testified in the United States District Court for the District of Maryland) and that it could not be retrieved.   **See Exhibit H-8.**  Eerhart was fully aware that the delay in funding put MVP at risk in terms of its leasehold interest in Baltimore County, and further, that the Funding Party was prepared to issue a Cancellation Notice.

16.     RJ Hispanic's fraud deprived MVP of $90,000 cash, and has surely caused and will continue to cause MVP other devastating and irreversible consequences.  **See Exhibits A, H14, H15, H16, H24, H27, and H28.**

17.     The space that MVP leased is unique to its success, and MVP will lose its opportunity to remain at Hunt Valley Towne Centre if it cannot find replacement funding.  Its landlord has threatened to withdraw from an existing Forbearance Agreement if this funding is not promptly completed, or if another willing tenant surfaces.  **See Exhibits A and H24.**

18.     MVP will go out of business, and perhaps have to file bankruptcy if this funding fails. **See Exhibit A.**

19.     Other serious consequences will befall MVP's contractors, who are owed money, and should MVP fail, it has been represented to MVP that several of their businesses will fail. **See Exhibit A.**  With perhaps one known exception, the contractors who performed services at MVP's Hunt Valley, Maryland location are Maryland entities.

20.     The Escrow Agent that was selected by RI Hispanic for the MVP transaction (and for at least two other unrelated transactions) has "disappeared," and MVP's funds presumably have disappeared with him.

21.     In Court and in an Affidavit filed with the Court as an Attachment to RI Hispanic's September 9, 2011 Motion to Alter or Amend, Eerhart conceded that the conditions precedent to any entitlement by RI Hispanic to the $90,000 have not been satisfied, and that MVP is entitled to its return.   Notably, the statements made in Eerhart's Sworn Statement (**Exhibit G**) and email (among others, **Exhibit H8**) claimed that RI Hispanic had fully performed.  Had that been the case, the conditions precedent would have been met.

## ARGUMENT
### A.   This Court has Jurisdiction over RI Hispanic Banc Group, LLC

The standards of review associated with Defendant's Motion to Dismiss are basic, and were discussed thoroughly in *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390 (4th Cir. 2003):

(1) When a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction, and in deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff. *Id*. at 396.

(2) For a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be met: (a) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (b) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Id*. at 396.

9

(3) A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has minimum contacts with the forum such that to require the defendant to defend its interest in that state does not offend traditional notions of fair play and substantial justice. *Id.* at 397.

(4) In determining whether specific jurisdiction exists in accordance with the due process clause, the court will consider: (a) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state; (b) whether the plaintiff's claims arise out of those activities; and (c) whether the exercise of personal jurisdiction would be constitutionally reasonable. *Id.* at 397.

(5) Even a single contact with the forum state may be sufficient to create specific jurisdiction over the nonresident defendant when the cause of action arises out of that single contact, provided that the principle of fair play and substantial justice is not thereby offended. *Id.* at 397.

(6) In the context of internet communications, when the defendant enters into a contract with the resident of a foreign jurisdiction and engages in the knowing and repeated transmission of computer files over the internet to that jurisdiction, he can be properly haled into the courts of that foreign jurisdiction in accordance with the due process clause. This is in contrast to situations where the defendant has a passive website. *Id.* at 399.

In Defendant's Motion to Dismiss for Lack of Jurisdiction and the accompanying Affidavit signed by Eerhart, much is made about the fact that Eerhart never visited Maryland until his September 9, 2011 hearing in this case and that he has no real office presence here. Before the Supreme Court decided *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), a person's physical "presence" in a territory was a prerequisite to a jurisdictional finding. Since that time,

10

however, the Supreme Court, and surely every United States District Court and United States Circuit Court of Appeals, have determined that a defendant's physical presence is unnecessary. As technology has evolved, so have the standards.  *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002).  In *Zippo Mfg. Co. v Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D. Pa. 1997), which is cited frequently by the United States Court of Appeals for the Fourth Circuit, the Court determined that when a person purposefully directs electronic activity into the State with the intention of engaging in business with the recipient, and when that activity creates in a person within the State a potential cause of action cognizable in the State's courts, it is appropriate to conclude that jurisdiction over the out of state party comfortably meets the due process clause of the Fourteenth Amendment.   *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, *supra*;  *ALS Scan, Inc., supra*, at 714.

The United States Supreme Court anticipated the evolution of electronic communications and their impact on jurisdictional issues in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) where it said:

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Keeton v. Hustler Magazine, Inc., supra,* 465 U.S., at 774-775, 104 S.Ct., at 1478; see also *Calder v. Jones,* 465 U.S., at 778-790, 104 S.Ct., at 1486-1487; *McGee v. International Life Insurance Co.,* 355 U.S., at 222-223, 78 S.Ct., at 200-201. Cf. *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 317, 63 S.Ct. 602, 605, 87 L.Ed. 777 (1943).

*Burger King Corp.*, 472 U.S. at 476.

There can be no doubt that RI Hispanic and Eerhart's electronic communications with MVP have been persistent, that they involve the transaction in question, and that they serve as the basis for cognizable causes of action within the State of Maryland.  This Court, *sua sponte*, identified the $90,000 escrow deposit by MVP as a source of concern, and its own development of the facts has led to the astonishing admissions by Eerhart in Court that he never had a direct banking relationship with Scotia Bank and that he never has spoken with anyone there!  Likewise, the Court's concerns and questions of Eerhart led to the determination that the Cape Canaveral Investments Trust Account was not an IOLTA account at all, and further, that the escrow agent chosen by RI Hispanic, Jose R. Yanez, has disappeared.

MVP has presented dozens of electronic communications from Eerhart, most directed to MVP in Maryland, and all of which constituted either fraud in the inducement or the cover-up.  It is clear that Eerhart knew at the outset that the promised $65 Million SBLC was intended to support the financing of MVP's project in Hunt Valley, Maryland.   And, it is evident that Eerhart, the alter ego of RI Hispanic, reached into Maryland to deprive MVP of the $90,000, and that his efforts to mislead MVP in Maryland have been persistent.  After this case began, Eerhart produced what appears to be a bogus SBLC for $65 Million.  **See e.g. Exhibit K (a new exhibit, attached hereto).**   It is dated July 17, 2001 – rather than 2011, and does not include a bank officer's name or PIN number.

In *Cole-Tuve, Inc. v. American Machine Tools Corp*., 342 F.Supp. 362 (D.Md. 2004) (Bennett, J.), this Court thoroughly reviewed the aforementioned legal principals where the fact pattern also concerned a matter of specific jurisdiction, and, as in the case at bar, an apparent intentional tort facilitated through the use of electronic communications was involved.  The Court determined there to be a sufficient factual basis to conclude that the defendant directed

harm at the Maryland plaintiff that would impact the Maryland plaintiff in Maryland and denied the defendant's Motion to Dismiss. *Cole-Tuve* is on point.

In *Aitken v. Communications Workers of America*, 496 F.Supp. 653 (E.D. Va. 2007), Plaintiffs' suit against a defendant who sent a series of emails to them, and who sought injunctive relief, was challenged by the defendant on jurisdictional grounds. The United States District Court rejected the jurisdictional challenge, even though the emails that were distributed were in the nature of SPAM, as distinguished from the direct and targeted communications in the case at bar. When a party purposefully avails itself of the privilege of conducting affairs in a state, even through electronic means, jurisdictional due process requirements are satisfied, particularly when the electronic contacts involve, directly, the matter at issue. *See also: Triad Capital Mgmt., LLC v. Private Equity Capital Corp.*, 2008 WL 410 4357 (N.D. Ill. Aug. 25, 2008) (specific jurisdiction upheld based on electronic communications. The forum state "can be rightly said to have an interest in protecting the claims of its citizens in contracts that are negotiated with citizens of foreign states …").

Finally, Defendant's argument that this Court lacks jurisdiction because the SBLC contains an Arbitration provision is equally without merit. The entire transaction with RI Hispanic assumed the truth of a predicate fact: that RI Hispanic was entering into a contract that it intended to perform. Instead, the entire transaction was a scam, and with it, the arbitration clause was fraudulently created. Further, the arbitration provision concerned only RI Hispanic, and the Complaint in this case will be amended to include multiple other parties, including Eerhart, individually. Until that time, the principals discussed in the Addendum to MVP's Memorandum in Support of its Request for Injunctive relief still apply. There, MVP noted that, even assuming that there is Arbitration jurisdiction, this Court retains simultaneous jurisdiction

over this dispute. The need for equitable relief is immediate, and resorting to Arbitration in the first instance will only frustrate MVP's ability to obtain it. *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986). Divesting the district court of the authority to enter a preliminary injunction, as a matter of law, is inappropriate when doing so would render some or a material part of any subsequent arbitration process a "hollow formality." *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985).

### B.   MVP's response to RI Hispanic's Non-Jurisdictional Contentions

The notion that MVP should be required to post bond in this case, as contended by RI Hispanic, is simply astonishing. In Court, and in an Affidavit previously filed, RI Hispanic and Eerhart make no claim to the $90,000, and Eerhart has now conceded that the conditions predicate to any entitlement on RI Hispanic's part have not been met.

The very subject of the issues now before the Court is the apparent loss of MVP's $90,000 to an escrow agent that was selected by RI Hispanic/Eerhart, and who has now disappeared. The Court has ordered RI Hispanic to deposit $90,000 into the Court Registry, and its Order has been met with non-compliance and failed assurances.

Similarly astonishing is RI Hispanic's contention that the damage to MVP caused by its fraud is limited to monetary damages. MVP has alleged in its Verified Complaint, and in an Affidavit signed by its Managing Member, that it stands to lose its leasehold opportunity at the Hunt Valley Towne Centre, in Baltimore County, Maryland. This Court was advised of the uniqueness of that specific property and the fact that MVP was designed around it, both physically and demographically. In short, these contentions by RI Hispanic have no merit.

## CONCLUSION

RI Hispanic, through a persistent course of contact with MVP in Maryland, is subject to the jurisdiction of this Court.

**WHEREFORE,** for the reasons stated, Plaintiff requests that Defendant's Motion to Dismiss for Lack of Jurisdiction be **DENIED**.


_____/s/_____
Jeffrey M. Kotz
Kandel, Klitenic, Kotz & Betten, LLP
Suite 610, Nottingham Centre
502 Washington Avenue
Towson, Maryland 21204
(410) 339-7100
Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing MVP, LLC's Opposition to Defendant RI Hispanic Banc Group, LLC's Motion to Dismiss for Lack of Jurisdiction was served via electronic filing on September 26, 2011, upon the following counsel for Defendant:

Samuel M. Riley, Esquire
Samuel M. Riley, LLC
409 Washington Avenue
Suite 200
Baltimore, Maryland 21204


_____/s/_____
Jeffrey M. Kotz

15